UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Rexanne Z., o/b/o C.M., a minor, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 18 CV 50408 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER[1]**

In 2008, when he was just over three years old, C.M. was found to be disabled based on several mental impairments. In 2015, when he was nine years old, the Agency concluded that he had medically improved and was thus no longer disabled. After a hearing, the administrative law judge agreed with this conclusion, finding that C.M. continued to have some mental limitations, but that they were not marked in any of the applicable child domains. The ALJ relied heavily on six teacher questionnaires. This appeal is filed by C.M.'s grandmother and legal guardian.[2] Her main argument is that the ALJ relied on select portions from these questionnaires while downplaying other portions favorable to C.M. The Court does not find this or plaintiff's other arguments sufficient to justify a remand.[3]

**BACKGROUND**

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] The Court will sometimes use the separate terms "plaintiff" and "C.M.'s grandmother," recognizing that they refer to the same person.
[3] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

1

On October 16, 2008, C.M. was found to be disabled based on developmental delays and autism spectrum disorder. R. 18.

In September 2013 and continuing through at least 2016, C.M. received counseling services at Rosecrance. It is not known exactly how frequent or consistent these visits were, and there was a gap of almost a year in 2015, according to plaintiff's summary. Dkt. #14 at 2.

From kindergarten to third grade, C.M. had an individual education plan ("IEP"). *Id.* at 3. In December 2014, he was found to be no longer eligible for continuing IEP services because he was not significantly behind his peers. R. 21.

In 2015, C.M.'s fifth grade teacher (Heather Tryggestad) completed a teacher questionnaire. *See* Ex. 8E. She stated that C.M. had a math level of a grade 3.6 and a reading level of 4.2. R. 214.

Sometime around March 2015, the continuing disability review was conducted. C.M. was then nine years old. He was found no longer disabled as of March 1, 2015.

On October 16, 2015, Dr. Mark Langgut, a psychological examiner, interviewed C.M. for 50 minutes. He administered a Weschler IQ test and then prepared a report. Ex. 15F. C.M. received a composite IQ score of 84, which fell in the low to average range. R. 496. Dr. Langgut listed the following conditions in the Axis I diagnosis: (i) trauma reaction of childhood, (ii) adjustment disorder, and (iii) childhood abuse/neglect victim. R. 497.

The administrative hearing was held on February 13, 2018. C.M. and his grandmother testified. Both the ALJ and plaintiff's counsel asked questions. Relevant portions of this testimony will be discussed below.

On March 29, 2018, the ALJ issued a 16-page decision. The ALJ found that, although C.M. still had "some limitations" from all his mental impairments, the "clear balance" of the

2

evidence indicated that these limitations were "nowhere near" marked levels in any of the six domains, which the ALJ analyzed individually. R. 21.

## DISCUSSION

Plaintiff's argument for a remand is mostly a factual argument. She has not asserted that the ALJ used the wrong legal standard, nor has she offered much serious discussion on how the legal standards should be interpreted. Given that there is no dispute over the legal framework, the Court will provide only a brief overview. Both the ALJ's decision, as well as the regulations cited below, provide a more comprehensive discussion.

To recap, the ALJ first applied the three-step framework for assessing medical improvements. *See* 20 C.F.R. § 416.994a(b). The ALJ determined that C.M. had medical improvement since the earlier disability determination, referred to in the regulation as the "comparison point decision." That date was December 11, 2008, and C.M. was then found to have marked limitations in the domains of acquiring and using information and interacting and relating with others (the first and third domains). R. 19. The ALJ concluded that C.M. had improved since that date. After considering other parts of the test, the ALJ eventually turned to the issue relevant here, which is whether C.M.'s current functionally equals a listing. In assessing this question, the ALJ considered C.M.'s abilities in six broad areas of functioning, known as the child domains. These domains are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To functionally equal a listing, the impairment must cause a "marked" limitation in two domains of functioning or an "extreme" limitation in one. 20 C.F.R. §

416.926a(a). A marked limitation is one that "interferes seriously" with the claimant's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).

Plaintiff challenges the ALJ's findings regarding the first three domains. As noted above, the only argument is that the ALJ engaged in cherrypicking. This argument can be considered in two phases—first the teacher questionnaires and then the remaining arguments.

## I.      The Teacher Questionnaires.

The ALJ relied on six teacher questionnaires, one from 2015 when C.M. was in the fifth grade and five from 2018 when he was in the seventh grade. Everyone seems to agree that these questionnaires are the central pieces of evidence. An argument could be made that the analysis both starts and ends with them.

The ALJ repeatedly mentioned the questionnaires throughout the opinion, and specifically cited to them as a key rationale for each of the three domains. The ALJ gave great weight to them because they were "mostly consistent" with each other and because these teachers were "uniquely able" to speak to C.M.'s abilities because they "consistently observed" him interacting with students and working in the classroom.[4] R. 29. Plaintiff does not challenge the general proposition that the teacher questionnaires in this case are a highly credible source of evidence, if not the most important pieces of evidence. In fact, plaintiff is relying on parts of these same questionnaires to affirmatively build her case that C.M. is disabled. And the Seventh Circuit likewise has held that teacher questionnaires are important. *See, e.g., Hopgood v. Astrue*, 578 F.3d 696, 700-03 (7th Cir. 2009) (remanding because the ALJ didn't fully consider the

---

[4] Ms. Tryggestad, the fifth grade teacher, taught all subjects, and thus saw C.M. for the whole day five days a week, although she had only been his teacher for a month at the time of the evaluation. R. 214. The five teachers in 2018 were subject teachers who saw C.M. every day of the school week for at least 47 minutes each. R. 692, 700, 708, 716, 724. At the time they completed their questionnaires, they had known C.M. for about a half of the school year.

teacher questionnaires stating, among other things, that the claimant had "serious" and "very serious" problems in several subcategories).

Having built up their importance, it is time to look at these questionnaires more closely. All six teachers completed the same Social Security form entitled "Teacher Questionnaire." The form has a separate section for each domain. Its layout is important to the arguments here. Rather than offering a verbal description, it will be easier to provide a screenshot. The Court will provide two. The first is from the questionnaire completed by Misty Murphy, plaintiff's English teacher. Set forth below is her analysis of the first domain:



5

R. 693.

The second example comes from the questionnaire completed by Denise Pape, C.M.'s

science teacher in 2018. This screenshot addresses the second domain:

Case: 3:18-cv-50408 Document #: 10-14 Filed: 02/15/19 Page 30 of 68 PageID #:737

## II. ATTENDING AND COMPLETING TASKS

EXHIBIT NO. 24F
PAGE: 11 OF 40

☐ NO problems observed in this domain; functioning appears age-appropriate.
*If you selected this block, go directly to Section III.*
☑ YES, the child has problems functioning in this domain.
*Please mark a rating for each activity listed below.*

**RATING KEY FOR ACTIVITIES LISTED BELOW**
**Compared to the functioning of same-aged children without impairments, this child has:**

☐ 1 No Problem ☐ 2 A slight problem ☐ 3 An obvious problem ☐ 4 A serious problem ☐ 5 A very serious problem

| # | Activity | Rating | Frequency of Problem |
|---|---|---|---|
| 1. | Paying attention when spoken to directly | 2 | Weekly |
| 2. | Sustaining attention during play/sports activities | 1 | |
| 3. | Focusing long enough to finish assigned activity or task | 2 | Weekly |
| 4. | Refocusing to task when necessary | 2 | Weekly |
| 5. | Carrying out single-step instructions | 1 | |
| 6. | Carrying out multi-step instructions | 2 | Monthly |
| 7. | Waiting to take turns | 1 | |
| 8. | Changing from one activity to another without being disruptive | 2 | Weekly |
| 9. | Organizing own things or school materials | 3 | Daily |
| 10. | Completing class/homework assignments | 2 | Daily |
| 11. | Completing work accurately without careless mistakes | 2 | Weekly |
| 12. | Working without distracting self or others | 2 | Weekly |
| 13. | Working at reasonable pace/finishing on time | 2 | Weekly |

What else can you tell us about the child's problems with these activities? For example, how independent is the child in doing them? Does the child get extra help, or an unusual degree of structure or support? If so, what kind and how often? (Continue on the last page if needed.)

███ fluctuates on completing work and staying on task. Ususally he is fine, but it seems like there are periods of time (1-4 days) if he is off task, then he is off for a length of time.

6

The Court has excerpted these two particular pages because they are the ones plaintiff has placed the most weight on, based on the frequency they were cited in the briefs. Plaintiff's argument stands or falls depending on how you interpret these two pages.

To understand plaintiff's argument, you need to first notice that there are two main boxes on each page. The first big box on the top half of the page (*i.e.* the checkbox ratings grid) is referred to in shorthand by plaintiff as the "ratings key" while the box at the bottom with the handwritten comments is referred to by plaintiff as the "paragraph statements." In a nutshell, plaintiff's theory is that these two boxes are in conflict, and that the ALJ failed to resolve this conflict, relying mostly on the ratings keys while mostly downplaying the paragraph statements.

The Court is not persuaded by this argument for several reasons, the main one being that the ALJ reasonably could have believed there was no conflict. Before discussing these reasons, it is important to establish a preliminary point plaintiff's argument skips over. This is the claim that, *if* these ratings keys were viewed by themselves, they would strongly support the ALJ's findings. As the ALJ noted several times, when viewed in the aggregate, the teacher ratings indicate that plaintiff's limitations were, roughly, in the mild category. This is a very generalized conclusion distilling a lot of different responses, but it is a conclusion that is nonetheless supported by substantial evidence. To be sure, the questionnaires include multiple sub-categories for each domain, and there is no single bottom-line rating for each domain. Also, each teacher included a mixture of ratings, and there is some variation among the six teachers, with some rating C.M.'s limitations as being more severe than others. For example, in the screenshot above from Ms. Murphy's questionnaire, she rated C.M. as having "obvious problems" in three sub-categories, "mild problems" in five sub-categories, and "no problems" in two sub-categories. By contrast, Ms. Tryggestad rated him in this first domain as having "obvious problems" in no

7

subcategories, "mild problems" in two sub-categories, and "no problems" in the remaining eight

out of ten sub-categories. R. 215. Most notably, none of the six teachers ever rated C.M. as

having "serious problems" in *any* sub-category for *any* of the three domains at issue.

One other issue not addressed directly by the parties is how to correlate the rating phrases

used in the teacher questionnaires with the phrases used in the regulations. Both of them use a

five-point scale. Neither side cited to any case law or regulatory guidance on how to correlate the

two rating scales. Absent any contrary authority, the most natural mapping in this Court's

opinion is that a "marked" limitation is equivalent to a "serious problem" on the teacher

questionnaire. This would make sense in that both are the fourth points on the five-point

ascending scales. Also, it fits with the statement in the regulation that a marked limitation is one

that "interferes seriously" with the claimant's abilities. *See* 20 C.F.R. § 416.926a(e)(2). If this

correlation is correct, then even a rating that C.M. had an "obvious problem" in a particular

domain would not be enough to establish a marked limitation. But even if an "obvious problem"

were enough, the overall average of all the six questionnaires still would fall short of this level.

This leads us back to plaintiff's conflict theory. Plaintiff believes that certain of the

teacher's handwritten statements in the second boxes showed that they believed C.M. had

marked limitations. Plaintiff states that these paragraph statements are in "conflict" with the

ratings keys.[5]

The Court finds this argument to be speculative. As a conceptual matter, this theory must

overcome a steep hurdle because it goes against the normal presumption that the person

completing the document was acting rationally. To illustrate this point, first consider a classic

"conflict of evidence" argument where one doctor opines X and another opines Y. In that case,

---

[5] Plaintiff does not go on to explain how this conflict, if it exists, should be resolved.

the conflict is between two different people, thus providing a reasonable explanation for the inconsistency. Next consider an example closer to the present case. This is when a doctor makes an observation about the claimant in the treatment notes during one visit, but then later, say a year later, renders a formal opinion seemingly at odds with the earlier observation. Although this example involves the same person making arguably contradictory statements, there are still factors that might reasonably explain the inconsistency (*e.g.,* the claimant's condition may have changed in the time gap).

But contrast these examples with the present case. Plaintiff's theory is that these teachers, acting in what would appear to be an irrational manner, set forth two inconsistent opinions not just in the same document, but on the same page of that document. Like the famous case of Dr. Jekyll and Mr. Hyde, this would appear to be a strange outcome. Put another way, absent some independent evidence to support this theory, the ALJ reasonably could have proceeded under the assumption that these teachers were rationale and informed when they completed these forms. That is, they were aware of their ratings given at the top of the page and were not trying at the bottom of the page to immediately contradict those ratings without acknowledging they were doing so. Presumably, if they had changed their mind, they could have erased their answers and changed them. Instead, the more rational assumption—and certainly one that is *a* reasonable interpretation—is that the teachers meant for their paragraph statements to be read consistently with the ratings, meaning that they did not believe that there was a conflict. And it is further reasonable to suppose that this is how the ALJ interpreted these statements. The Court finds no error in this commonsense interpretation. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("we give [an ALJ's opinion] a commonsensical reading.").

9

This conclusion is reinforced by looking at the specific paragraph statements plaintiff believes are at odds with the ratings keys. Plaintiff's reply brief provides the following bullet-point list summarizing what plaintiff presumably believes are the strongest of these statements:

- Has a hard time removing distractions (R. 693)

- Needs to be checked on frequently (R. 693)

- Works best with an empty desk so he can't lose focus (R. 694)

- Fluctuates on completing work and staying on task. Usually he is
  fine, but if he is off task he is off for a length of time (R. 702)

Dkt. #22 at 1. As the citations indicate, the first three statements are from Ms. Murphy and the fourth is from Ms. Pape. Plaintiff believes that these statements are in conflict with the teacher ratings. But this contention is hard to prove or disprove because these statements are vague and not necessarily inconsistent with the corresponding ratings. For example, it is not clear why Ms. Murphy's comment that plaintiff had a hard time removing distractions was inconsistent with her ratings, which included "obvious" limitations in a few of the subcategories. Ms. Pape's statement that C.M. fluctuates in staying on task but is "usually" fine seems like a middle-ground position that reasonably could be viewed as being consistent with both Ms. Pape's ratings, as well as with the ALJ's findings.[6]

One final point that should not be lost in this discussion. The ALJ did not *entirely ignore* the paragraph statements. As plaintiff recognizes, the ALJ discussed some of them, including two from Ms. Murphy. *See* Dkt. #14 at 8 (plaintiff: "The ALJ did acknowledge [Ms. Murphy's] statements that C.M. has a hard time removing distractions and needs to be checked on

---

[6] In her reply brief, plaintiff makes a few more arguments in this vein, asserting that the questionnaires "universally mention problems with focus" and that C.M. was unable to "control his hyperactivity." Dkt. #22 at 3. But these contentions are again so general that, even if true, they are not necessarily inconsistent with the ALJ's findings.

frequently to ensure focus and writing[.]"); *id.* at 8-9 ("The ALJ also recognized Danielle

Townsend['s] statements that C.M. requires frequent redirections and that he benefits from

additional support in the classroom[.]"). To the extent that the ALJ did not discuss every single

one of these statements, that is not an error because the ALJ is not required "to address each

piece of evidence individually." *Buckhanon v. Astrue*, 368 Fed. App'x. 674, 680 (7th Cir. 2010).

      In sum, contrary to plaintiff's claim that the ALJ "rejected" the handwritten comments,

the Court finds that the more commonsensical reading is that the ALJ simply viewed them as

being consistent with the ratings keys. The issue in this case is the degree of C.M.'s limitations,

not an either-or question of whether there are any limitations at all. Plaintiff's arguments too

often fall into the latter category.

## II.    The Other Cherrypicking Arguments.

      The remaining arguments are briefer and much less developed. The Court does not find

that they justify a remand either individually or collectively.

      **No IEP in 2014.** In December 2014, C.M.'s school determined that he did not qualify for

continuing IEP services he had been receiving for approximately three years. Dkt. #14 at 3.

Plaintiff argues that the "lack of an IEP *alone* is not *conclusory* that C.M. had no marked

impairments." *Id.* at 9 (emphasis added). This argument aims at a straw man. Although the ALJ

mentioned the lack of an IEP as one reason supporting the decision, the ALJ clearly did not

claim that this reason "alone" justified the decision. As discussed in Section I, the teacher

questionnaires were the main piece of evidence. The Court finds that the ALJ's decision would

still be supported by substantial evidence even if this IEP rationale were disregarded. Plaintiff

has not raised any argument that the ALJ's discussion rested on a factual error.

**Performing Below Grade Level and Needing Teacher Support.** Plaintiff argues that in 2018 C.M. was performing several grades below level in reading and math and that he needed teacher support in the classroom. Dkt. #14 at 9. But these facts come from the teacher questionnaires and therefore suffer from the same problem discussed previously. These teachers were aware of these facts when they provided their key ratings.

**Therapy Notes from Rosecrance.** Plaintiff argues that the ALJ gave insufficient weight to therapy notes from C.M.'s counseling sessions at Rosecrance over several years. Plaintiff believes these records demonstrated more serious problems than the ALJ found. This argument is unavailing for several reasons.

First, the mere fact that C.M. reported some difficulties at some therapy visits is not incompatible with the ALJ's findings. The ALJ acknowledged the Rosecrance records but found that, on the whole, they did not undermine the ALJ's conclusions. *See* R. 21 (noting that "the evidence reflects some fluctuations in symptoms, but there is no evidence of significant or persistent mental status deficits" in the Rosecrance therapy notes). This is the same problem of vagueness in that these statements do not necessarily rebut the ALJ's specific findings.

Second, plaintiff employs her own brand of cherrypicking by isolating a few statements from the broader continuum of statements. For example, plaintiff cites to a statement from June 2016 stating that C.M. had shown a "lack of progress in developing communication skills." Dkt. #14 at 12 (citing R. 593). But this statement, which is vague (see point #1), is only one of several from these notes. Plaintiff does not include the other statements, including that C.M. "demonstrated coherence and clear concentration and attention throughout the session" and that C.M. "was not very talkative, but was cooperative with directions." R. 593. The difficulty comes in trying to link these statements back to the specific criteria for the three domains. For example,

12

even if true that C.M. exhibited lack of progress in his "communication skills" at this one visit, does this really mean that he had marked limitation in the third domain of interacting with others, especially if the therapist also noted that he was "cooperative"? Likewise, the statement that C.M. had "clear concentration" throughout the entire 60-minute session seems, if anything, to support the ALJ's position regarding the second domain rather than plaintiff's position.

**C.M.'s Testimony About Arguing With Teachers.** Plaintiff argues that the ALJ overlooked the fact that C.M. argued with his teachers. But the only evidence plaintiff cited to support this claim is in the following brief exchange with the ALJ:

> Q  So you maybe have four, five, six different teachers during the day. Is that right?
>
> A  Mm-hmm.
>
> Q  Okay. Now how do you get along with your teachers? Do you get along with them well or *not so much*?
>
> A  Some *not so much*; some yes.
>
> Q  Okay. The ones that you don't get along with all that well, what's the issue with them? What *problems* have you been having?
>
> A  *Problems*?
>
> Q  I mean are they not nice to you, or do you have *arguments with them*, or why not so well with those?
>
> A  *Arguments sometimes*.

R. 46 (emphasis added). The exchange ends there. This testimony is not especially compelling—it is short and vague ("sometimes" and "arguments" are not defined) and was prompted by leading questions (*see* italicized portions).

But the bigger problem is that it is not integrated with the other evidence—most notably, the teacher questionnaires. If C.M. were arguing with his teachers in the way suggested by

plaintiff, then those very teachers would have been aware of those arguments and would have incorporated them into their questionnaires. Some teachers did make comments about C.M.'s periodic problems with cooperation. But these comments were presumably reflected in the bottom-line ratings, which as demonstrated previously, do not support plaintiff's argument.

**State Agency Consultants.** Plaintiff in her opening brief argues that the ALJ "relied heavily" on the opinions from the state agency physicians. Dkt #14 at 7, 12. But in her reply she seems to reverse course, stating that "the ALJ himself did not claim to have relied on the opinions of the state agency reviewing consultants." Dkt. #22 at 2. This argument is unclear and undeveloped, and it is a non-issue in any event because the Court finds that the ALJ's decision would rest on substantial evidence even without these opinions.

In conclusion, the Court agrees with the Government when it asserts that a remand would essentially require this Court to substitute its judgment in place of the ALJ's judgment, one this Court finds is reasonable. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (a court should not remand "if reasonable minds can differ over whether the applicant is disabled").

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date:  April 29, 2020                                    By:    _____
                                                                          Lisa A. Jensen
                                                                          United States Magistrate Judge

14
